# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| **KADY NAVARRO,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 3:19-cv-01103** |
| **ROBERT J. YOUNG COMPANY, LLC** | **JUDGE CAMPBELL** |
| **d/b/a RJ YOUNG,** | **MAGISTRATE JUDGE FRENSLEY** |
| **Defendant.** | **JURY DEMAND** |

---

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Comes the Plaintiff Kady Navarro ("Plaintiff" or "Navarro") by and through counsel, and files this Response in Opposition to Defendant's ("RJ Young") Motion for Summary Judgment. As a matter of law and in light of the facts, both disputed and undisputed, the Motion should be denied.

On her second day back from maternity leave, Plaintiff, Kady Navarro ("Navarro"), who suffered from postpartum depression, met with Chad LaGrone ("LaGrone"), her supervisor at Defendant, Robert J. Young Company, LLC d/b/a RJ Young's ("RJ Young"). During this meeting, Navarro candidly admitted that she had struggled with postpartum depression, was still working out childcare issues, and was adjusting to being back in the workplace. Instead of supporting

Navorro's return to work, LaGrone questioned her dedication to her job as a sales manager. After that meeting, LaGrone set the wheels in motion to demote Navarro. Less than three weeks later, RJ Young terminated Navarro's employment after she recorded her conversation with LaGrone in an attempt to document his discrimination. Numerous issues of material fact require that this case be decided by a jury. RJ Young's summary judgment motion should be denied.

## STATEMENT OF FACTS

### A.     Navarro Begins Her Employment With RJ Young

Navarro began working for RJ Young in April 2013 as an offensive sales representative for the Ricoh sales team *(*Navarro Dep. 19*)*. Within a few months, Navarro was promoted to sales representative *(*Navarro Dep. 19-20*)*. She achieved President's Club in her second year of employment *(*Navarro Dep. 20*)*.

### B.     Navarro's History of Postpartum Depression

In June 2016, Navarro took leave under the Family and Medical Leave Act ("FMLA") in connection with the birth of her first child *(*Navarro Dep. 56*)*. She suffered severe postpartum depression that required hospitalization *(*Lipsitz Dep. 13-16; Navarro Dep. 57*)*.[1] Navarro's treating physician, Dr. Nancy Lipsitz, a Board-certified obstetrician/gynecologist, recommended that Navarro go to the psychiatric emergency room because she believed that Navarro was at risk of hurting herself or her baby *(*Lipsitz Dep. 16*)*. Navarro was admitted to Vanderbilt hospital for one night *(*Lipsitz Dep. 16*)*. Because of Navarro's severe postpartum depression, Dr. Lipsitz did not release Navarro to work until August 24, 2016, and she provided information about Navarro's diagnosis of postpartum depression to RJ Young *(*Lipsitz Dep. 9, 18-19, 20; Lipsitz Ex. 2*)*.

---

[1] "Postpartum depression can be quite debilitating" *(*Lipsitz Dep. 11*)*. It is a "very serious illness" that "can affect people's ability to care for themselves. It can affect their ability to care for their babies. It can impact their relationships, their ability to work, and to function." *(*Lipsitz Dep. 11-12*)*.

After she returned to work, Navarro was promoted to team lead for the Ricoh sales team on September 1, 2016 *(Navarro Dep. 21-22, 56-57)*.  Based on her success in the team lead role, Navarro was promoted to sales manager[2] in charge of the Ricoh team in May 2017 *(Crotts Dep. 43; LaGrone Dep. 21, 35; Navarro Dep. 25, 27)*.  As sales manager, Navarro always hit or exceeded her quota *(Navarro Dep. 30)*.

### C.  Navarro Takes FMLA Leave For the Birth of Her Second Child

Navarro gave birth to her second child in September 2018 and had similar issues with postpartum depression.[3]  Navarro took FMLA leave beginning on September 26, 2018 *(LaGrone Dep. 36; Navarro Dep. 64-65)*.  Her FMLA paperwork submitted to RJ Young indicated that Navarro would need twelve weeks of leave for postpartum physical recovery and mental care due to her history of severe postpartum depression and anxiety *(Lipsitz Dep. 22)*.

Shortly before Navarro's baby was born, Dr. Lipsitz prescribed Zoloft for Navarro's postpartum depression *(Lipsitz Dep. 21-22; Navarro Dep. 78)*.  Despite taking Zoloft, in late 2018 or early 2019, Navarro suffered from symptoms of postpartum depression, including sadness, lack of energy and motivation, sleep loss, and anxiety *(Navarro Dep. 78)*.  Her symptoms affected her ability to take care of her two-year old *(Navarro Dep. 78-79)*.

Near the end of her maternity leave, Navarro communicated with Melissa Raines, interim team lead for the Ricoh sales team, while Navarro was out on maternity leave, about her postpartum depression *(Navarro Dep. 66, 70)*.  Around December 10, 2018, Navarro told Raines she was feeling uneasy about her return to work because of her emotional state and hormonal changes *(Navarro Dep. 67-69)*.  Navarro was emotional because child care arrangements had fallen

---

[2] Sales managers are compensated with a combination of salary and commission *(Crotts Dep. 37)*.

[3] If a patient has a history of postpartum depression, she is more likely to develop postpartum depression in subsequent pregnancies *(Lipsitz Dep. 12)*.

through and she wasn't sure she would have the flexibility she needed when she returned to work (*Raines Dep. 18-19*).  Navarro floated the idea of switching jobs with Raines so that Raines could think about it in case Navarro decided the sales manager position was too much for her (*Navarro Dep. 67-69*).  Navarro reiterated that she didn't know if she wanted to switch jobs and that she needed to get back and see if returning to work helped her heal (*Navarro Dep. 70*).  Raines agreed that Navarro "wasn't trying to say she didn't want to be there and do that, I just think she was concerned" (*Raines Dep 19*).  Raines agreed that Navarro should return to the sales manager role and revisit her options at a later time (*Navarro Dep. 74; Raines Dep. 19, 25*).

Navarro returned to work on December 26, 2018 (*LaGrone Dep. 37; Navarro Dep. 65*).  After she returned, Navarro told Raines "that's where she wanted to be was in that position, and that coming back to work and being around everybody, you know, brought that to light" (*Raines Dep. 24*).

### D.    Navarro Meets with LaGrone to Catch Up

On December 27, 2018, her second day back from FMLA leave, Navarro set up a meeting with her supervisor, Chad LaGrone, Vice President of Technology Services, to get "up to speed" on what she missed while she was out and "catch up on some changes that had taken place" (*Navarro Dep. 85-86; LaGrone Dep. 40*).  Navarro "asked about some changes that had been made to (*her*) team" that she wanted to discuss (*Navarro Dep. 86*).

During that meeting, LaGrone asked Navarro how she was doing (*Navarro Dep. 87*).  "(I)n an attempt to kind of build a relationship with (*LaGrone*)[4], (*Navarro*) told him about (*her*) past experience with (*her*) first pregnancy and then (*her*) experience with (*her*) 2018 pregnancy" (*Navarro Dep. 86*).  She told him she was hospitalized at Vanderbilt and went through extensive

---

[4] Lagrone transferred to Nashville and took over the Vice President of Technology Services position immediately before Navarro began here second maternity leave.  (Navarro Dep., pp. 29, 70-72).

day-long therapy for postpartum depression (Navarro Dep. 87). She told him she was proactive for her second pregnancy and so while it was difficult, she thought she handled it better by being proactive with medication but that she still had symptoms (Navarro Dep. 87-88). She told him about her lunch with Raines and that she wanted to get back into her sales manager role and see if she could do it (Navarro Dep. 88). She told LaGrone that if she didn't feel she could handle the sales manager role once she got back into it, she would let him know and she would gracefully step down and move back to a sales role (Navarro Dep. 89). She also told LaGrone that she felt anxiety about coming back to work and arranging full-time child care (Navarro Dep. 104). Navarro asked LaGrone to see the compensation plan for the sales manager position (Navarro Dep. 91-92). LaGrone did not offer Navarro any encouragement or support (LaGrone Dep. 89-90).

At the end of the meeting, they agreed that they would "see where things go down the road" (LaGrone Dep. 41). It was going to be Navarro's "decision to make, whether to move back into a sales role or stay a sales manager" (Navarro Dep. 112). Contrary to that agreement, LaGrone almost immediately contacted his supervisors, Mike Noffsinger and Chris Clark, and decided to demote Ms. Navarro to a sales representative role without any further input from Navarro (LaGrone Dep. 49-50, 73).[5] They also decided to promote Melissa Raines to sales manager (LaGrone Dep. 51-52).[6] Before informing Navarro of the decision, Noffsinger, Clark, and LaGrone discussed the decision to demote Navarro with Kerry Crotts, Vice President of People and Culture (LaGrone Dep. 56-57).

---

[5] Clark and others at RJ Young were aware of Navarro's issues with postpartum depression because she has talked about it at work and posted about it on social media (Navarro Dep. 132-33; Raines Dep. 21). Clark, in particular, was Navarro's Facebook friend (Navarro Dep. 133).

[6] Although LaGrone asserts that Raines was not promoted to sales manager until after January 17, 2019, when Navarro's employment was terminated, before that time, employees on Navarro's team had asked if Raines was the new sales manager (Navarro Dep. 108). Notably, although Raines has children, they were adults (Raines Dep. 7).

### E.     LaGrone Invites Navarro to a "Comp Review" Meeting

On January 14, 2019, LaGrone sent Navarro a calendar invite for a January 15 meeting entitled "Comp Review" (LaGrone Dep. 48; LaGrone Dep. Ex. 27).  Based on where she and LaGrone left things after their December 27, 2018 meeting and the calendar invite, Navarro went to the meeting expecting to receive her compensation plan for 2019 for the sales manager position (Navarro Dep. 101).

When she got to the meeting, LaGrone did not present her with a compensation plan (LaGrone Dep. 67).  Instead, LaGrone informed her that the decision had been made to demote her to a sales representative role (Navarro Dep. 102).  Navarro was "shocked" and upset (Navarro Dep. 102; LaGrone Dep. 63).  She protested and explained that she wanted to keep the sales manager position, but LaGrone told her that her that the decision had already been made (LaGrone Dep. 62, 73).  LaGrone said he had talked with Noffsinger and Clark and that the three of them were not comfortable with some of the things Navarro told him (Navarro Dep. 102). Navarro asked LaGrone if she had done anything to make him believe she couldn't do the sales manager job (Navarro Dep. 96).  LaGrone said she hadn't (Navarro Dep. 96, 122).  When Navarro reminded LaGrone that after their December 27, 2018 meeting they had left it as a decision for her to make after being back for a little while, LaGrone said that's not what we are doing (Navarro Dep. 102-03).  Navarro felt betrayed (Navarro Dep. 103).

LaGrone promised to talk with Noffsinger and Clark again, however, and meet with Navarro again the next day (LaGrone Dep. 62, 71; Navarro Dep. 105-06).  LaGrone was not prepared to inform Navarro what she would be making (LaGrone Dep. 69-70).  Navarro never saw a comp plan (Navarro Dep. 65, 92).

6

On the next day, January 16, 2019, Navarro met with LaGrone again. He reiterated that the decision to demote her would stand and nothing could be done (LaGrone Dep. 72; Navarro Dep. 114). He did not consider allowing Navarro to remain in the sales manager position and see how she performed (LaGrone Dep. 73). Navarro told LaGrone she felt like she was being discriminated against (LaGrone Dep. 85; Navarro Dep. 115). LaGrone did not report Navarro's complaints of discrimination to Human Resources (LaGrone Dep. 85). Nor did he tell his supervisor or RJ Young's General Counsel that Navarro believed she was being discriminated against (LaGrone Dep. 85-86). RJ Young did nothing to investigate Navarro's claims of discrimination (Crotts Dep. 107-08).

Navarro recorded her meeting with LaGrone on January 16th because she believed she was being discriminated against and was being demoted based on LaGrone's statement that he struggled with her mental health issues (Navarro Dep. 112-14).[7] She didn't know that recording the meeting was against company policy (Navarro Dep. 113). She did not recall seeing RJ Young's policy against recording other employees in the office, nor had she seen it enforced when people recorded video on Snapchat or Instagram while at work (Navarro Dep. 51).

F.     RJ Young Terminates Navarro's Employment

The following day, LaGrone called Navarro into a meeting with Kerry Crotts (Navarro Dep. 124). Crotts asked whether Navarro had recorded the meeting with LaGrone (Navarro Dep. 125). She admitted that she had (Navarro Dep. 125). RJ Young then used that fact to terminate

---

[7] While LaGrone claims that he was not aware of Navarro's postpartum depression issues until mid-January (LaGrone Dep. 75), it is clear from the recording of the January 16, 2019 meeting that Ms. Navarro disclosed these issues to him when they met in late December. LaGrone did not correct Navarro on January 16 when she referred to the discussion they had in December about her medical history (LaGrone Dep. 82-83). LaGrone admits that he and Navarro discussed her medical history on January 15 and 16, but he conveniently denies knowing about it earlier (LaGrone Dep. 82).

Navarro's employment under a policy that has never been used to discipline or terminate any other employees of RJ Young *(*Crotts Dep. 133; Navarro Dep. 125*)*.[8]

## ARGUMENT

Summary judgment is proper only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "*(*I*)*n deciding whether summary judgment is appropriate, *(*the court must*)* refrain from 'weigh*(*ing*)* the evidence and determin*(*ing*)* the truth of the matter,' and instead simply ask whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Equal Employment Opportunity Comm'n v. West Meade Place, LLP*, 841 Fed. App'x 962, 966 (6th Cir. 2021) (citations omitted). Here, the evidence demonstrates a substantial disagreement between the parties about the circumstances surrounding RJ Young's decision to demote and ultimately terminate Navarro's employment. A jury must decide whether RJ Young discriminated or retaliated against Navarro in violation of the law.

### I.    RJ Young Interfered With Navarro's FMLA Rights and Retaliated Against Her for Using FMLA Leave

"*(*A*)*n employer is prohibited from discriminating against employees ... who have used FMLA leave, nor can they use the taking of FMLA leave as a negative factor in employment actions." *Marshall v. The Rawlings Co.*, 854 F.3d 368, 377 (6th Cir. 2017) (quotations and citations omitted). "This prohibition includes retaliatory discharge for taking leave. ... It also includes demotion for taking leave." *Id.* (quotations and citations omitted).

If an employer "interferes with the FMLA-created right to medical leave or to reinstatement following the leave, a violation has occurred." *Id.* at 384. *See Crawford v. JP Morgan Chase &*

---

[8] RJ Young's policy "requests" that employees refrain from using any recording device without prior consent during any conversation regarding any job-related function *(*Crotts Dep. Ex.23*)*. LaGrone, Crotts, and Ralph Mello, RJ Young's General Counsel, decided to terminate Navarro's employment *(*Crotts Dep. 51, 58*)*.

*Co.*, 531 Fed. App'x 622, 625-26 (6th Cir. 2013) (finding a question of fact regarding the plaintiff's FMLA interference claim where the plaintiff claimed that she was transferred to a non-equivalent position "shortly after she returned from FMLA leave"). RJ Young interfered with Navarro's right to reinstatement when she returned from FMLA leave. On her second day back from leave, LaGrone began the process of demoting Navarro to a sales representative role. RJ Young argues that it escapes liability because it never finished demoting her but instead fired her. A jury, however, should decide whether RJ Young complied with its obligations under the FMLA.

To establish a prima facie case of FMLA retaliation, a plaintiff must show that (1) she exercised a protected FMLA right; (2) she was adversely affected by an employment decision; and (3) there was a causal connection between the two actions. *See Maxwell v. GTE Wireless Serv. Corp.*, 121 F. Supp. 2d 649, 657 (N.D. Ohio 2000). The evidentiary burden for demonstrating a causal connection is "minimal." *Womack v. Brown-Forman Corp.*, 897 F. Supp. 2d 646, 661 (E.D. Tenn. 2012); *Dage v. Time Warner Cable*, 395 F. Supp. 2d 668, 676 (S.D. Ohio 2005). And, the Sixth Circuit has held that "acutely close temporal proximity between the protected activity and the adverse employment action is deemed indirect evidence such as to permit an inference of retaliation*(.)*" *Womack*, 897 F. Supp. 2d at 661 (quotations omitted).

RJ Young argues that there was no causal connection between Navarro's use of FMLA leave and her demotion and/or termination. Nevertheless, "in the Sixth Circuit, temporal proximity is a factor that can establish a causal connection, especially when the adverse action occurs within a few days or weeks of the exercise of the FMLA right." *Maxwell*, 121 F. Supp. 2d at 658 (quotations and citations omitted). LaGrone began the process of demoting Navarro on her second day back from FMLA leave. The decision to demote Navarro was made within a couple of days after December 27, 2018 meeting with Lagrone, a few days after her return to work. (Lagrone

Dep., pp. 49-50; 73). Her employment was terminated less than one month after she returned to work. That timing is sufficient to establish a causal connection. The Sixth Circuit "has determined that a two to three month period between protected activity and adverse employment action was sufficient to establish a causal connection." *Frazier v. Richland Public Health*, 685 Fed. App'x. 443, 455-56 (6th Cir. 2017). Temporal proximity is measured "from the date FMLA leave expired, not just when the employee first requested it …." *Judge v. Landscape Forms, Inc.*, 592 Fed.Appx. 403, 410 (6th Cir. 2014). Moreover, "when 'discharge *(*takes*)* place on the heels of protected activity' evidence demonstrating such a connection 'is generally enough to satisfy the third element of the prima facie test.'" *Maxwell*, 121 F. Supp. 2d at 658 *(*quoting *King v. Preferred Technical Group,* 166 F.3d 887, 893 (7th Cir.1999).

RJ Young contends that it was justified in deciding to demote Navarro because she asked about moving back to a sales representative role and thus demonstrated a lack of commitment to her job as a sales manager. Navarro disputes RJ Young's characterization of her meeting with LaGrone. RJ Young's stated reason for demoting Navarro is pretextual. "A plaintiff establishes pretext by showing that the proffered reason had no basis in fact, did not motivate the termination, or was insufficient to warrant the termination." *Marshall*, 854 F.3d at 379 (quotations and citations omitted). In this case, RJ Young's proffered reason has no basis in fact. Navarro wanted to remain in the sales manager position and asked that she be allowed to do so *(*Navarro Dep. 88*)*. *See Jones v. Aaron's Inc.*, 748 Fed. App'x 907, 918 (11th Cir. 2018) ("In short, in the record as it stands now, there is a factual dispute as to whether Aaron's proffered non-retaliatory reason for reducing Jones's hours—because she requested it—is true."). Likewise, RJ Young's proffered reason for terminating Navarro's employment is pretextual. No other employee had ever been disciplined or terminated under the recording policy *(*Crotts Dep. 133; Navarro Dep. 125*)*..

## II. RJ Young Discriminated Against Navarro Because of A Disability - Her Postpartum Depression

To prevail on a claim of discrimination under the Americans with Disabilities Act ("ADA"), or the Tennessee Disability Act,[9] a plaintiff must show that she (1) is disabled, (2) is otherwise qualified to perform the essential functions of the position, with or without accommodation, and (3) suffered an adverse employment action because of her disability. *See Harrison v. Soave Enters.*, *LLC*, 826 Fed. App'x 517, 522 (6th Cir. 2020). A plaintiff can prove that she has a disability by showing that she (1) has a physical or mental impairment that substantially limits a major life activity; (2) has a record of such an impairment; or (3) is regarded as having such an impairment. *See id.*

Under the ADA, as amended in 2008, the definition of disability is construed broadly. *See Chaniott v. DCI Donor Servs., Inc.*, 481 F. Supp.3d 712, 722 (M.D. Tenn. 2020). "'An impairment need not prevent, or significantly or severely restrict ... a major life activity' to be substantially limiting.' … (quoting 29 C.F.R. § 1630.2(j)(1)(ii)). Similar to the term 'major life activities,' '*(t)*he term "substantially limits" shall be construed broadly in favor of expansive coverage' and 'is not meant to be a demanding standard.'… (quoting 29 C.F.R. § 1630.2(j)(1)(i))." *Harrison*, 826 Fed. App'x at 522 (citations omitted). "The ADA defines 'major life activities' to 'include ... caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working' 42 U.S.C. § 12102(2)(A)." *Chaniott*, 481 F. Supp. 3d at 722-23. The operation of major bodily functions, including brain function, also constitute major life activities. *See* 29 C.F.R. §1630.2(i)(1)(ii). According to the regulations, it "should easily be concluded" that some

---

[9] Disability discrimination claims under the Tennessee Disability Act are analyzed in the same way as ADA claims. *See Nance v. Goodyear Tire & Rubber Co.*, 527 F.3d 539, 553 n.5 (6th Cir. 2008).

impairments, including major depressive disorder, substantially limit brain function. 29 C.F.R. §1630.2(j)(3)(i).

RJ Young argues that Navarro, who suffered from postpartum depression, was not disabled between December 2018 and January 2019 and that her postpartum depression did not substantially limit a major life activity. The evidence in the record does not support RJ Young's contention.

Navarro was diagnosed with postpartum depression so severe after her first pregnancy that she was treated at the psychiatric emergency room and hospitalized overnight because her doctor feared that she would harm herself or her baby *(*Lipsitz Dep. 13-16; Navarro Dep. 57*)*. Her postpartum depression symptoms returned during and after her second pregnancy. Navarro was again treated for postpartum depression *(*Lipsitz Dep. 39*)*. She was placed on Zoloft on September 20, 2018, which she was still taking as of February 2019 *(*Lipsitz Dep. 21-22, 24; Navarro Dep. 149*)*. Depression requiring medication, counseling, and medical leave qualifies as a disability. *See Maxwell v. GTE Wireless Serv. Corp.*, 121 F. Supp. 2d 649, 656 (N.D. Ohio 2000). Navarro testified that, even though she was taking Zoloft, her postpartum depression caused lack of energy, sadness, loss of sleep, and anxiety and that it interfered with her ability to perform daily activities such as caring for her two-year old *(*Navarro Dep. 78-79*)*. At a minimum, there is enough evidence in the record to allow a jury to decide whether Navarro was actually disabled. *See Harrison*, 826 Fed. App'x at 524 (noting that the episodic nature of a disability such as postpartum depression and separation anxiety makes no difference under the ADA as long as the impairment would substantially limit a major life activity when active). In light of the broad definition of disability, evidence of Navarro's symptoms, her continuing treatment with Zoloft, and her diagnosis of postpartum depression could lead a reasonable jury to find that her postpartum depression

substantially limited a major life activity, including sleeping or thinking, while she worked for RJ Young. *See Covington v. Johnson*, 2019 WL 4827228 at *5 (S.D. Ill. Oct. 1, 2019) (holding that a plaintiff who is on medication for a condition does not have to stop taking her medication "and put herself at the full mercy of her medical condition before she could prove her condition was disabling").

Navarro also qualifies as disabled because she has a record of postpartum depression. "A plaintiff has a 'record of impairment' if she has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." *Williams v. AT&T Mobility Servs., LLC*, 186 F. Supp. 3d 816, 825 (W.D. Tenn. 2016). "The plaintiff only needs to show that 'at some point in the past' she had a substantially limiting impairment." *Id.* It is undisputed that Navarro has a history of postpartum depression severe enough to require overnight hospitalization based on risk of self-harm or harm to her baby. It is also undisputed that RJ Young was informed of Navarro's postpartum depression each time she took FMLA leave in connection with her pregnancies. And Navarro informed LaGrone of her experience with postpartum depression *(*Navarro Dep. 86-88*)*. As a matter of law, RJ Young had a record of Navarro's impairment due to postpartum depression. *See id.* (holding that employer had a record of plaintiff's mental impairment where plaintiff requested and received leaves of absence for depression and anxiety).

In addition, the evidence in the record also demonstrates that RJ Young regarded Navarro as disabled. A plaintiff can establish a "regarded as" claim based on an actual or perceived physical or mental impairment "*whether or not the impairment limits or is perceived to limit a major life activity.*" 42 U.S.C. § 12102(3)(A) (emphasis added). "Under the Americans with Disabilities Act, your employer can't fire you because they *think* you are disabled, even if, in fact, you are *not*

disabled." *Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308, 310–11 (6th Cir. 2019). "A claim under the 'regarded as' prong requires no showing about the severity of the impairment." *West Meade Place,* 841 Fed. App'x at 967.  RJ Young knew that Navarro suffered from postpartum depression.  That information was included in the FMLA paperwork submitted to RJ Young in 2016 and in 2018.  She freely discussed her experience with postpartum depression at work and on social media *(*Navarro Dep. 132-33*)*.  Moreover, Navarro discussed her postpartum depression and symptoms with LaGrone *(*Navarro Dep. 86-88*)*, who immediately decided to demote her.  A reasonable juror could decide that RJ Young regarded her as disabled and decided to demote and ultimately terminate her because of her perceived limitations.

Furthermore, RJ Young's reasons for demoting and terminating Navarro are pretextual. "An employee seeking to show that the reason given for the adverse action against him was pretext may do so by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Chaniott*, 481 F. Supp. 3d at 724.

LaGrone decided to demote Navarro because she discussed her postpartum depression with him on December 27, 2018 *(*Navarro Dep. 86-88*)*, and he became concerned that she could not perform the sales manager job.  Although the decision had already been made to demote Navarro, LaGrone invited Navarro to a "comp review" meeting even though he was not prepared to discuss any compensation plan.  It was a demotion meeting.  In addition, even though RJ Young claims that it terminated Navarro's employment because she recorded her meeting with LaGrone in order to document his discrimination, that policy has not been enforced against any other employee. *(*Crotts Dep. 133; Navarro Dep. 125*)*.

### III. RJ Young Discriminated Against Navarro Because of Her Pregnancy

"Under the Pregnancy Discrimination Act ("PDA") provisions of Title VII, discrimination because of or on the basis of pregnancy, childbirth, or related medical conditions is defined as a kind of sex discrimination and is prohibited." *Bonner-Gibson v. Genesis Eng'g Group,* 2019 WL 3818872 at *8 (M.D. Tenn. Aug. 14, 2019) (quoting *Tysinger v. Police Dep't of City of Zanesville*, 463 F.3d 569, 572 (6th Cir. 2006)). To prove a prima facie case of pregnancy discrimination, a plaintiff must show that "(1) she was pregnant, (2) she was qualified for her job, (3) she was subjected to an adverse employment decision, and (4) there is a nexus between her pregnancy and the adverse employment decision." *Id.*[10]

Navarro has proven a prima facie case of pregnancy discrimination. Navarro was pregnant just before RJ Young decided to demote and ultimately terminate her employment. *See id.* ("The PDA applies to 'women affected by pregnancy, childbirth, or related medical conditions,'—not just to women who *are* pregnant."). RJ Young first argues that Navarro was not qualified for her job because she allegedly expressed doubt about continuing to serve as a sales manager, but Navarro disputes that she expressed any lack of commitment to her job. Although she discussed the possibility of moving back to a sales representative position with LaGrone on her second day back at work while she was anxious and having difficulty finding child care, she did not tell LaGrone that she did not want to be a sales manager. Navarro told LaGrone the same thing that she told Melissa Raines – that she wanted to be a sales manager but that she was concerned about going back while she was having trouble arranging child care and wondered whether she would have the flexibility she needed *(*Raines Dep. 19, 24*)*. Likewise, the fact that Navarro recorded a

---

[10] "Tennessee courts may appropriately look to decisions of federal courts construing Title VII when analyzing claims under the *(*Tennessee Human Rights*)* Act." *Payne v. Goodman Mfg. Co., L.P.*, 726 F. Supp. 2d 891, 903 (E.D. Tenn. 2010).

meeting with LaGrone does not render her unqualified for the sales manager position.  LaGrone admitted to Navarro that she had not done anything to make him believe she was not capable of performing the sales manager job *(*Navarro Dep. 96, 122*)*.

Although RJ Young contends that temporal proximity is not sufficient to demonstrate a nexus between Navarro's pregnancy and her demotion and/or termination, "the Sixth Circuit has squarely held that '*(*t*)*emporal proximity can ... satisfy the nexus requirement in the pregnancy discrimination context.' *Asmo v. Keane, Inc.*, 471 F.3d 588, 593 (6th Cir. 2006)."  *Harmon v. Honeywell Intelligrated*, 2021 WL 2373662 at *8 (S. D. Ohoi June 10, 2021).  RJ Young argues that there is no nexus between Navarro's pregnancy and her demotion or termination because RJ Young learned of Navarro's pregnancy prior to September 2018 but took no adverse action against her until December 2018 and January 2019.  It asserts that the Court should calculate temporal proximity from the time that it learned of Navarro's pregnancy.  Nevertheless, "the PDA reaches discrimination based on events that might occur after an employer learns of the employee's pregnancy. The date on which the pregnancy was announced, therefore, might not be the only important date for temporal proximity purposes." *Bonner-Gibson*, 2019 WL 3818872 at *9.  Here, RJ Young set about demoting Navarro on her second day back from maternity leave, while she was still undergoing treatment for postpartum depression and after she had a conversation with LaGrone about her postpartum depression, anxiety, and child care difficulties.  There is ample evidence from which a nexus can be inferred, including LaGrone's questioning Navarro's continued dedication to her job.  *Id.* (finding requisite nexus to establish prima facie case of pregnancy discrimination where the plaintiff's supervisor voiced concerns that "she would no longer be sufficiently dedicated to her job following her pregnancy").

16

RJ Young's reasons for demoting and terminating Navarro are pretextual. "To establish pretext, a plaintiff can show that the employer's proffered reasons (1) have no basis in fact; (2) did not actually motivate the adverse action; or (3) were insufficient to explain the adverse action." *Id.* at *11. "Pretext may be shown either directly by persuading the *(*trier of fact*)* that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707 (6th Cir. 2006)).

RJ Young's explanation for demoting Navarro – her supposed lack of commitment to the sales manager position – is directly related to her pregnancy and caregiver responsibilities. Moreover, LaGrone willfully misled Navarro into believing she would receive a comp plan when, all along, he intended to demote her to a sales representative position. Navarro was treated much like another sales representative who returned to work after maternity leave to find that she was being reassigned to a less productive territory and the deals in her previous territory would be closed by another sales representative *(*Crotts Dep. 138-39; Navarro Dep. 41*)*. Finally, the policy RJ Young relied on to terminate Navarro's employment after she complained of discrimination had never been used to discipline or terminate any other employee *(*Crotts Dep. 133; Navarro Dep. 125*)*. *See Upshaw v. Ford Motor Co.*, 576 F.3d 576, 589 (6th Cir. 2009) (finding pretext where employer's preferred reason for termination – failing to wear a safety vest -- had not resulted in discipline or termination of other employees).

## IV.    RJ Young Retaliated Against Navarro Because She Complained of Discrimination

To establish a prima facie case of retaliation, a plaintiff must demonstrate that (1) she engaged in a protected activity, (2) her exercise of such protected activity was known by the defendant, (3) thereafter, the defendant took adverse action against the plaintiff, and (4) a causal

connection existed between the protected activity and the materially adverse action. *See Bonner-Gibson*, 2019 WL 3818872 at *10. Here, Navarro's employment was terminated after she complained that RJ Young was discriminating against her by demoting her to a sales representative position (*LaGrone Dep. 85; Navarro Dep. 115*). RJ Young sought to demote Navarro because of LaGrone's questions about Navarro's "dedication to her job, an issue … tied to her pregnancy and her becoming a mother." *Id.* at *11. Navarro's termination took place less than twenty-four hours after she met with LaGrone and complained that she was being discriminated against. The "temporal proximity of less than a day is easily sufficient" to support an inference of a causal connection. *Id.* A jury could easily find that RJ Young's purported reason for terminating Navarro's employment was pretextual. RJ Young's policy that requested that employees not record job-related meetings had never been used to discipline or terminate any other employee (*Crotts Dep. 133; Navarro Dep. 125*).

## V.     RJ Intentionally or Negligently Inflicted Emotional Distress Upon Navarro

When RJ Young decided to demote Navarro two days after she returned form maternity leave and to terminate her employment under a policy that had never been enforced, it subjected Navarro to emotional distress. Liability for intentional infliction of emotional distress exists where (1) defendant's conduct is outrageous and beyond the pale of decency and (2) it results in serious mental injury. *See C.D. Swallows v. Western Elec. Co.*, 543 S.W.2d 581 (Tenn. 1976). Navarro testified that she was embarrassed and humiliated as a result of RJ Young's actions (*Navarro Dep. 147-48*). Although RJ Young argues that Navarro's negligent infliction of emotional distress claim is barred by the Tennessee Workers' Compensation statute, that "statute explicitly excludes 'psychological or psychiatric response(s) due to the loss of employment or employment

opportunities.'" *Jeffries v. Emerson Indus. Auto.*, 2015 WL 11019141 at *2 (W.D. Tenn. Feb. 20, 2015).

**CONCLUSION**

There is ample evidence in the record from which a jury could reasonably conclude that RJ Young decided to demote Navarro to a sales representative and then to terminate her employment because she took FMLA leave in connection with the birth of her second child and was suffering from postpartum depression. On her second day back from FMLA leave, RJ Young questioned Navarro's commitment to her sales manager job based on stereotypes and assumptions that she would no longer be sufficiently dedicated to her work, even though Navarro insisted that she wanted to remain a sales manager, and it began the process of demoting her. When she complained of discrimination, instead of investigating, RJ Young manufactured a reason to terminate her employment using a policy that it had admittedly never before enforced. RJ Young's motion for summary judgment should be denied.

Respectfully submitted,

*/s/ James C. Bradshaw III*
James C. Bradshaw III,   BPR #013170
Meredith L. Eason,   BPR #030183
**WYATT, TARRANT & COMBS, LLP**
333 Commerce Street, Suite 1050
Nashville, TN  37201
615.244.0020
jbradshaw@wyattfirm.com
meason@wyattfirm.com

*Counsel for Plaintiff, Kady Navarro*

## <u>CERTIFICATE OF SERVICE</u>

   I hereby certify that a true and exact copy of the foregoing was served upon the following via U.S. Mail on this the 23rd day of July 2121.

  Jennifer Gingery Cook
  BAKER, DONELSON, BEARMAN,
  CALDWELL & BERKOWITZ, P.C.
  Baker Donelson Center
  211 Commerce Street, Suite 800
  Nashville, Tennessee 37201
  (615) 726-5600 / Facsimile (615) 744-5760
  jcook@bakerdonelson.com

  Savannah Dabney McCabe
  BAKER, DONELSON, BEARMAN,
  CALDWELL & BERKOWITZ, P.C.
  265 Brookview Centre Way, Suite 600
  Knoxville, Tennessee 37919
  (865) 971-5170 / Facsimile (865) 329-5170
  smccabe@bakerdonelson.com

  *Attorneys for Defendant*

              ***/s/ James C. Bradshaw III***